# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CEDAR RAPIDS DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

A 2004 WHITE CADILLAC
ESCALADE,
VIN # 3GYEK62N04G114958,

    Defendant,

And Concerning

JUAN DIAZ-MONDRAGON,

    Claimant.

No. C11-0050

RULING ON MOTIONS FOR
SUMMARY JUDGMENT

---

## TABLE OF CONTENTS

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.   PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.  ISSUES PRESENTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

IV.  LEGAL STANDARD FOR SUMMARY JUDGMENT . . . . . . . . . . . . . . . 2

V.   RELEVANT FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

VI.  DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    A.   Was the Vehicle Used to Facilitate the Sale of Controlled
        Substances? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
        1.   Hearsay Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
        2.   Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
    B.   Does the Vehicle Represent Proceeds from the Sale of Controlled
        Substances? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
    C.   Is the Claimant an Innocent Owner? . . . . . . . . . . . . . . . . . . . 19

VII. ORDER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

# I. INTRODUCTION

This matter comes before the Court on the Motion for Summary Judgment (docket number 10) filed by the Government on September 15, 2011, and the "Countermotion" for Summary Judgment (docket number 12) filed by the Claimant on October 6, 2011. Pursuant to Local Rule 7.c, the motions will be decided without oral argument.

# II. PROCEDURAL HISTORY

On May 4, 2011, the United States of America filed a Verified Complaint for Forfeiture *In Rem* (docket number 1), naming a 2004 White Cadillac Escalade as Defendant.

On June 8, 2011, Juan Diaz-Mondragon timely filed a Verified Claim (docket number 6) and Answer (docket number 7).

On July 6, 2011, the Court adopted a Scheduling Order and Discovery Plan submitted by the parties. By agreement of the parties, the case was referred to the undersigned magistrate judge for the conduct of all further proceedings.

On September 15, 2011, the Government filed the instant motion for summary judgment. On October 6, 2011, the Claimant filed his resistance to the Government's motion. On the same date, the Claimant filed a "countermotion" for summary judgment.

# III. ISSUES PRESENTED

In its motion for summary judgment, the Government asks that the Court summarily order forfeiture of the 2004 white Cadillac Escalade. In his "countermotion," the Claimant asks that the case be dismissed and the vehicle returned to him.

# IV. LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). "An issue of fact is genuine when 'a reasonable jury could return a verdict for the nonmoving party.'" *Friends of Boundary Waters Wilderness v. Bosworth*, 437 F.3d 815, 821 (8th Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248 (1986)). A fact is a "material fact" when it "might affect the outcome of the suit under the governing law. . . ." *Anderson*, 477 U.S. at 248. The court must view the record in the light most favorable to the nonmoving party and afford it all reasonable inferences. *Baer Gallery, Inc. v. Citizen's Scholarship Foundation of America, Inc.*, 450 F.3d 816, 820 (8th Cir. 2006).

Procedurally, the moving party bears the initial responsibility of informing the court of the basis for its motion, and must identify those portions of the record which it contends show a lack of a genuine issue of material fact. *Heisler v. Metropolitan Council*, 339 F.3d 622, 631 (8th Cir. 2003). Once the moving party has successfully carried its burden under Rule 56(c), the nonmoving party has an affirmative burden to go beyond the pleadings and by depositions, affidavits, or otherwise, designate "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *see, e.g., Baum v. Helget Gas Products, Inc.*, 440 F.3d 1019, 1022 (8th Cir. 2006) ("Summary judgment is not appropriate if the non-moving party can set forth specific facts, by affidavit, deposition, or other evidence, showing a genuine issue for trial."). The nonmoving party must offer proof "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. "'Evidence, not contentions, avoids summary judgment.'" *Reasonover v. St. Louis County, Mo.*, 447 F.3d 569, 578 (8th Cir. 2006).

## V. RELEVANT FACTS

On June 20, 2010, Maria and Gamaliel Hernandez assigned the title to the subject vehicle to the Claimant.[1] According to his affidavit filed as part of Claimant's appendix, Gamaliel Hernandez is the owner of La Camelia Mexican Restaurant in Cedar Rapids.[2] Claimant worked as a server at La Camelia from June 2009 until January 2010. According to the affidavit, Maria and Gamaliel Hernandez sold the vehicle to Claimant for $10,000

---

[1] *See* Assignment of Title; Claimant's App. at 13.

[2] *See* Affidavit of Gamaliel Hernandez; Claimant's App. at 16.

on June 20, 2010, with $8,000 paid down in cash and the remaining $2,000 paid in cash at a later date.[3]

Approximately two weeks later, on July 5, 2010, Claimant drove the vehicle to Waterloo, Iowa, with Jaime "Jimmy" Mondragon ("Mondragon") and Tony Miranda-Rodriguez ("Miranda") as passengers.[4] According to an affidavit signed by DEA Task Force Officer Steven R. Warner, phone calls between Jacinto Rivera-Mendoza ("Rivera") and Miranda were intercepted by court-authorized wiretaps earlier that day. Rivera instructed Miranda to tell Mondragon to take "that" to a female in Waterloo, Iowa.[5] Surveillance officers then followed Miranda, Mondragon, and Claimant to Waterloo, where they observed the men meeting with a Hispanic female.[6] In response to the Government's request for admissions, Claimant admitted "being with" Miranda and Mondragon while meeting with a female in Waterloo. Claimant denied, however, "having any knowledge of cash being exchanged during this meeting."[7] Later that same day, officers intercepted a second phone call, in which Miranda told Rivera that the "thing" had been delivered to the "fat lady."[8]

---

[3] The sellers turned the vehicle plates in to the Iowa Department of Motor Vehicles on July 2, 2010. A confidential informant told law enforcement officers that Claimant, because of his illegal alien status, put "paper plates" on the vehicle. The paper plates were from a car dealership in Cedar Rapids called Miranda Auto Sales and Repair, which was operated by Tony Miranda-Rodriguez's cousin, Cosme Miranda. *See* Government's Statement of Material Facts (docket number 10-1), ¶ 12 at 4.

[4] Claimant Juan Diaz-Mondragon is Jaime Mondragon's cousin.

[5] *See* Affidavit of Steven R. Warner; Plaintiff's App. at 6.

[6] *Id.*

[7] *See* Claimant's Response to Request for Admissions; Plaintiff's App. at 92.

[8] *See* Affidavit of Steven R. Warner; Plaintiff's App. at 7.

The Government asserts that at the meeting in Waterloo on July 5, 2010, Mondragon delivered $1,000 to the Hispanic female. The Government is relying on information obtained from Abraham Romero-Gembe ("Romero") in an interview on March 15, 2011. Romero was shown the surveillance photo from July 5, 2010, and identified the Hispanic female as his daughter.[9] Romero told authorities that Rivera had provided $1,000 in drug money to be delivered to Romero's daughter, so that Romero could be transported back to the United States "to resume delivery of illegal drugs for the organization."[10] Apparently, Romero had been deported to Mexico in February 2010, after having been convicted of illegal reentry into the United States. Romero reported returning to the United States in July 2010 and receiving one pound of methamphetamine from two Hispanic males at Coral Ridge Mall in Iowa City.[11]

On July 8, 2010 – three days after the meeting in Waterloo – Michael Sean Brecht ("Brecht") was arrested after picking up methamphetamine from Rivera at a residence on B Street SE in Cedar Rapids, Iowa. On the following day, July 9, a search warrant was executed at the B Street residence. The Claimant "admits to living for a time" at the B Street residence, but he moved from that address "in early July."[12]

Also on July 9, 2010, authorities intercepted three phone calls between Claimant and Miranda. In the first call, Miranda tells Claimant:

> Hey, don't worry. Your truck is safe and we already did the change of that shit to it. [BACKGROUND: Tell him that you put in the best kind.] And I put in the best kind of the one that it has to use, synthetic.

---

[9] *Id.*

[10] *Id.*

[11] Initially, Romero reported receiving the drugs on July 6, but later told authorities that he received the drugs on July 22. *See id.*

[12] *See* Claimant's Response to Request for Admissions; Plaintiff's App. at 92.

Government's Statement of Material Facts (docket number 10-1), ¶ 15 at 5.

In the second phone call, Claimant asks Miranda why "you guys" turned off their phones, calling them a "bunch of scarty [*sic*] cats." After Miranda denied that his phone had been turned off, he and Claimant discussed the search at the B Street residence:

> Tony: Yeah, Fucker. Hey, what happened? Did you go over there?
>
> Juan: No. My brother called me and told me that there were no more cops or anything.
>
> Tony: They left?
>
> Juan: Yeah. I don't know.
>
> Tony: No, fool. We shouldn't get too comfortable.
>
> Juan: Whatever they took, they took already, you know what I mean? We need to let it cool down a little.
>
> Tony: Yeah, exactly. Um, try not to take the truck out, dude.
>
> Juan: We should still go make runs out there anyways. But why the truck, dude? We shouldn't have to do anything with it.
>
> Tony: No, but we don't owe anything. You know what I mean? We didn't have anything at the fucking house, besides we didn't even live there anymore.
>
> Juan: Exactly, that's what I'm telling you. The only thing I'm fearing is that I had "business" there.
>
> Tony: Yeah.
>
> Juan: That's the only thing I'm fearing, if they found it, then it all is going to go to hell, yo know what I mean? Either way, I'll just wait a little while, and then get a ride over there to see if I can find it, if not, then I'm

fucked. If I can't find it, then I'm going to be worried
a little, because . . .

Tony: The fucking problem is what was done inside. I think
they ripped the sofa, the carpet and everything.

Juan: That's what I'm afraid of. If they ripped the carpet,
then I'm fucking screwed.

Tony: That's fucked up.

Juan: We'll see what happens.

*Id.* at 6-7.

Later in the same conversation, Claimant tells Miranda that "we should go check
to see what they did." According to Claimant, "we need to go see if there are cops
around, and if there are none, we'll walk up to the place and knock down some doors."[13]
Claimant and Miranda discuss whether the police found anything, with Claimant
concluding:

Yeah, but if they didn't find anything what can they say?
Nothing. What are they going to accuse us of, but if they
found something they'll accuse us then, but if they didn't find
anything, then no.

*Id.* at 8.

In the third phone conversation on July 9, Claimant tells Miranda that Brecht
(known as "El Diablo") "probably ratted you out."[14]

The 2004 white Cadillac was seized from Claimant on or about October 19, 2010.
Gamaliel Hernandez reported to law enforcement officers that Claimant failed to report to

---

[13] *See* Government's Statement of Material Facts (docket number 10-1), ¶ 15 at 7.

[14] *Id.* at 9.

work at La Camelia two days after the vehicle was seized.[15] Claimant was subsequently arrested in the Southern District of Iowa and indicted on December 15, 2010, for possession of a false identification document.[16] Claimant pleaded guilty to the charge and was sentenced on April 28, 2011 to time served.[17]

Miranda, Mondragon, and Romero have all been convicted of conspiracy to distribute methamphetamine, and have received lengthy prison terms.[18]

## VI. DISCUSSION

The Government seeks forfeiture of the 2004 white Cadillac Escalade titled to Claimant Juan Diaz-Mondragon. The Government claims that "it was used to deliver drug money to Waterloo, Iowa."[19] The Government also asserts that the property "represents drug proceeds from the illegal trafficking of controlled substances by [Claimant] and others."[20] It is alleged that the vehicle is subject to forfeiture pursuant to 21 U.S.C. § 881(a):

> The following shall be subject to forfeiture to the United States and no property right shall exist in them:
>
> . . .
>
> (4) All conveyances, including aircraft, vehicles, or vessels, which are used, or are intended for use, to transport, or in any manner to facilitate the transportation, sale, receipt, possession, or concealment of property described in paragraph (1), (2), or (9).

---

[15] *Id.*; ¶ 16 at 10.

[16] *Id.*; ¶ 17 at 10.

[17] *Id.*; ¶¶ 18-19 at 10.

[18] *Id.*; ¶¶ 26-28 at 11-12.

[19] *See* Verified Complaint for Forfeiture *In Rem* (docket number 1) at 2.

[20] *Id.*

. . .

> (6) All moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter.

Title 21 U.S.C. § 881(a).

In the brief filed in support of his countermotion for summary judgment, Claimant argues that the Government is unable, as a matter of law, to establish a substantial connection between the vehicle and the alleged illegal activity. Claimant further argues that there is no evidence that the vehicle was purchased with proceeds from the sale of drugs. Finally, Claimant argues that he is an "innocent owner" pursuant to 18 U.S.C. § 983(d).[21]

Civil forfeiture procedures were significantly modified by the passage of the Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"). *United States v. Real Property Located at 3234 Washington Ave. North, Minneapolis, Minnesota,* 480 F.3d 841, 842 (8th Cir. 2007). First, the government has the burden of establishing, by a preponderance of the evidence, that the property is subject to forfeiture. 18 U.S.C. § 983(c)(1). Here, the Government asserts that the vehicle is subject to forfeiture because it was used to facilitate the sale of controlled substances (21 U.S.C. § 881(a)(4)) and/or was purchased with proceeds from the sale of a controlled substance (21 U.S.C. § 881(a)(6)). Under the Government's first theory – that the vehicle was used to facilitate the commission of a criminal offense – the Government must also establish that there was a "substantial connection" between the vehicle and the offense. 18 U.S.C. § 983(c)(3).

---

[21] The Court notes parenthetically that neither party argues that there are any procedural defects in the filing of the United States' complaint, or the filing of Diaz-Mondragon's verified claim and answer.

### A. Was the Vehicle Used to Facilitate the Sale of Controlled Substances?

Claimant admits that on July 5, 2010, he drove the vehicle to Waterloo, Iowa, with Mondragon and Miranda as passengers. The Government asserts that Mondragon, acting on instructions from Rivera, delivered $1,000 to a Hispanic female. According to the Government, the money was given to Romero's daughter, so that Romero could return to the United States and resume his participation in the illegal delivery of drugs. The Government does not claim that any controlled substances exchanged hands on July 5, 2010, nor does the Government present any evidence that the vehicle was used to transport Claimant or others to any other drug transaction.[22] Instead, the Government apparently asserts that the vehicle facilitated the sale of controlled substances by assisting in Romero's return to the United States.

#### 1. Hearsay Evidence

The Claimant first argues that in determining whether the Government has met its burden of proof, the Court may not rely on statements allegedly made by Romero, as contained in Agent Warner's affidavit, because they are hearsay. In support of his argument, Claimant cites *United States v. $92,203 in United States Currency*, 537 F.3d 504 (5th Cir. 2008). There, the district court granted the government summary judgment in its action to forfeit cash concealed on the claimant's person and inside his vehicle. The government relied on an affidavit submitted by an ICE special agent. In reversing the district court, the Fifth Circuit Court of Appeals reviewed "the procedures by which the Government could obtain a civil forfeiture" after the enactment of CAFRA. *Id.* at 508. Previously, the government's initial burden was one of "probable cause." CAFRA requires, however, that the government establish by a preponderance of the evidence that

---

[22] The Government argues, however, that based on his comments during the intercepted phone conversations, "it is clear Claimant was also involved in illegal drug trafficking." *See* Government's Brief (docket number 10-2) at 8.

the property is subject to forfeiture. According to the Fifth Circuit, "[t]his increase in the Government's burden – from probable cause to preponderance of the evidence – has caused numerous lower courts to hold that hearsay evidence is no longer permissible post-CAFRA." *Id.* at 509. Applying the canons of statutory construction, the Court concluded that "by enacting CAFRA, Congress intended to end the practice of reliance on hearsay in civil forfeiture decisions." *Id.* at 510.

The issue is not, however, entirely free from doubt. Three days after the Fifth Circuit filed its opinion in *$92,203 in United States Currency*, the Eleventh Circuit Court of Appeals issued its opinion in *United States v. $291,828 in United States Currency*, 536 F.3d 1234 (11th Cir. 2008). The Eleventh Circuit stated that to obtain civil forfeiture, "[t]he government 'may use both circumstantial evidence and hearsay,' and the district court should evaluate the evidence presented with 'a common sense view to the realities of normal life.'" *Id.* at 1237 (citing a pre-CAFRA Eleventh Circuit opinion). It should be noted, however, that the admissibility of hearsay was apparently *not* an issue raised by the claimant in the Eleventh Circuit case, nor did the Court discuss the issue of whether CAFRA affected the admissibility of hearsay evidence.

More recently, the issue was addressed by the Fourth Circuit in *United States v. Currency, U.S., $147,900.00*, 2011 WL 4866473 (C.A. 4 (N.C.) October 14, 2011). There, the government presented hearsay evidence regarding the claimant's involvement with drugs. The claimant did not object to the hearsay in the district court, but argued on appeal that the government offered "little more than rank hearsay" to support its argument. *Id.* at *3 n.2. Since the claimant did not object in the district court, the Fourth Circuit assessed the admissibility of the hearsay evidence "only for plain error." After noting the Fifth Circuit and Eleventh Circuit cases cited above, the Fourth Circuit concluded that "we cannot hold admission of the [hearsay] evidence to be plain error." *Id.*

The Court believes that the view expressed by the Fifth Circuit in *$92,903 in United States Currency*, is the prevailing opinion. While the issue has not been addressed directly by the Eighth Circuit, language found in *Real Property Located at 3234 Washington Avenue* supports this view: "The summary judgment inquiry depends on 'the substantive evidentiary standard of proof that would apply at the trial on the merits.'" 480 F.3d at 844 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). If the Government is not permitted to present hearsay evidence at trial to meet its burden of proving by a preponderance of the evidence that the property is subject to forfeiture, then it may not rely on hearsay evidence in seeking summary judgment.

Here, the Government concedes in its reply that "hearsay evidence cannot be the sole basis for forfeiture."[23] The Government argues, however, that Agent Warner "was one of the primary case agents" in the investigation of the drug conspiracy and "spent endless hours" monitoring phone conversations.[24] The Government asserts that Warner was "fully aware" of the phone calls relating to the July 5, 2010 trip to Waterloo, that Warner participated in the July 9, 2010 search at the B Street residence, that Warner interviewed Gamaliel Hernandez regarding Claimant's employment, and that Warner participated in the proffer interview of Romero.

The Court concludes that portions of Agent Warner's affidavit may be considered for these purposes, and portions may not. Warner has personal knowledge of the circumstances surrounding the investigation and the phone calls which were intercepted pursuant to Court authorization. The Court also notes that in response to the Government's request for admissions, Claimant admitted having the phone conversations

---

[23] *See* Government's Reply (docket number 13) at 1.

[24] *Id.* at 2.

12

with Miranda on July 9, 2010.[25] Other allegations contained in Warner's affidavit, such as Claimant's purchase of the vehicle and Claimant's failure to return to work after the vehicle was seized, are also admitted by Claimant.[26] However, statements attributed by Warner to Romero constitute inadmissible hearsay. In other words, at the time of trial Warner would not be permitted to testify regarding statements made by Romero, and the Government is likewise unable to rely on those statements here.[27] *See Real Property Located at 3234 Washington Avenue*, 480 F.3d at 844 ("A summary judgment inquiry depends on 'the substantive evidentiary standard of proof that would apply at the trial on the merits.'").

Disregarding the statements attributable to Romero, the evidence establishes that Rivera instructed Miranda to tell Mondragon to take "that" to a female in Waterloo, Iowa. Claimant was then seen driving Miranda and Mondragon to Waterloo, where they met with a Hispanic female. Later that day, Miranda told Rivera in a phone call that the "thing" had been delivered to the "fat lady."

Three days later, authorities searched a residence in Cedar Rapids, where Claimant had previously been living.[28] On the following day, July 9, authorities intercepted three phone calls between Claimant and Miranda. In the second call, Claimant discussed the search with Miranda. The Government asserts that "the gist" of the second phone

---

[25] *See* Plaintiff's App. at 4.

[26] *Id.* at 6-7.

[27] In its reply, the Government makes a passing reference to the fact that "a statement of a co-conspirator" is not hearsay evidence, but offers no evidence that Claimant and Romero were co-conspirators, and the statements were not made in furtherance of the alleged conspiracy. Claimant notes that he was *not* charged in the conspiracy case filed against 12 defendants. *See* Plaintiff's App. at 39-46.

[28] The record is silent regarding whether any contraband was found during the search.

conversation "implicates Claimant in the illegal activities."[29]  Claimant asserts that the conversations "were regarding the crime of possessing false identification documents, and had nothing to do with controlled substances or the trafficking thereof."[30]  Claimant was subsequently indicted and pleaded guilty in the United States District Court for the Southern District of Iowa to using a false identification document to obtain employment.[31]

## 2.  Analysis

For the Government to prevail on its motion for summary judgment on its first theory, the record must show that there is no genuine issue regarding whether the vehicle was used to facilitate the sale of a controlled substance.  In making this determination, the Court must view the record in the light most favorable to Claimant.  The *only* admissible evidence presented by the Government in this regard is that the vehicle was used to transport Claimant, along with two others, to a meeting with a Hispanic female in Waterloo.  During this meeting, the "thing" was delivered to the "fat lady."  While the two passengers subsequently pleaded guilty to conspiracy to distribute methamphetamine, there is no evidence that drugs were transported to Waterloo that day, or that any money was paid in exchange for drugs.  In fact, the Government asserts through the use of hearsay evidence that $1,000 in cash was delivered that day to enable Romero's return to the United States.  While the Government characterizes the money as "drug money," it offers no evidence to support that allegation.

Three days later, a search was conducted of a residence formerly occupied by Claimant, and the following day authorities intercepted phone conversations between Claimant and Miranda.  During those conversations, Claimant expresses concern regarding what the "cops" may have found during the search, and states that he had "business" at

---

[29]  *See* Government's Brief (docket number 10-2) at 10.

[30]  *See* Claimant's Brief (docket number 11) at 7.

[31]  *See* Plaintiff's App. at 47-54.

the residence. According to Claimant, "if they found it, then it is all going to go to hell, you know what I mean?" The issue before the Court is not, however, whether Claimant was involved in illegal activity, but whether the vehicle – which Claimant had acquired approximately two weeks prior to the July 5 road trip – was used to facilitate the sale of controlled substances. Viewing the evidence in the light most favorable to Claimant, the Government has failed to establish that there is no genuine issue regarding whether the vehicle was used to facilitate the sale of drugs.

Conversely, when considering Claimant's countermotion, the Court must view the evidence in the light most favorable to the Government. The Government does *not* claim that drugs were transported in the vehicle on July 5, 2010, nor does the Government provide any evidence that drugs were transported in the vehicle on any other date. Instead, relying on hearsay in Agent Warner's affidavit, the Government asserts that the vehicle was used to deliver $1,000 to Romero's daughter, so that Romero could return to the United States and resume his participation in the illegal delivery of drugs. "The term 'facilitate,' as used in the context of the forfeiture statute, has been interpreted to encompass activity making the prohibited conduct less difficult or 'more or less free from obstruction or hindrance.'" *United States v. Premises Known as 3639 2nd St., N.E., Minneapolis, Minnesota*, 869 F.2d 1093, 1096 (8th Cir. 1989). It can be argued that the vehicle was used to facilitate Romero's return to the United States, which in turn facilitated the sale of controlled substances.

Even *if* the vehicle is subject to forfeiture because it was used to facilitate the sale of controlled substances, the Government must also establish that there was a "substantial connection" between the vehicle and the commission of a criminal offense. 18 U.S.C. § 983(c)(3). "[T]here must be 'something more than an incidental or fortuitous contact between the property and the underlying illegal activity, although the property need not be indispensable to the commission of' the offense." *United States v. Lewis*, 987 F.2d 1349,

1356 (8th Cir. 1993) (quoting *Premises Known as 3639 2nd St. N.E., Minneapolis, Minnesota*). Even viewing the evidence in the light most favorable to the Government, and considering Romero's statements to authorities, the Court concludes that the Government is unable to establish a "substantial connection" between the vehicle and the sale of controlled substances. At most, the record shows the vehicle was used to deliver money to Waterloo, not for the purchase of any controlled substances, but rather to secure the return of Romero to the United States. While Romero subsequently engaged in the sale of controlled substances after his return to the United States, the role of the 2004 white Cadillac Escalade was merely incidental to the later criminal activity. Accordingly, the Court concludes that the record supports summary judgment in favor of Claimant on the Government's first theory of forfeiture.

### B. Does the Vehicle Represent Proceeds from the Sale of Controlled Substances?

Alternatively, the Government argues that the vehicle was purchased with proceeds from the sale of drugs, and is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6). In its motion for summary judgment, the Government argues that the undisputed facts establish that the vehicle *was* purchased by Claimant with drug money. In his countermotion for summary judgment, Claimant argues that the undisputed facts establish that the vehicle *was not* purchased with drug money.

According to an affidavit signed by Gamaliel Hernandez, Claimant worked as a server at La Camelia from approximately June 2009 until January 2010.[32] Claimant was paid $4.35 per hour, plus tips. According to La Camelia's payroll register, Claimant was paid every two weeks.[33] By the Court's calculation, Claimant averaged approximately 34 hours per week. Claimant worked a total of 1,143 hours which, at $4.35 per hour,

---

[32] *See* Affidavit of Gamaliel Hernandez, Claimant's App. at 16.

[33] *See* Payroll Register, Claimant's App. at 18-20.

resulted in gross income of $4,972.05. In addition, Claimant reported tips during that time period of $3,926.00, for a total income of $8,898.05.[34]

Claimant argues that the $8,898.05 in income which he earned as an employee at La Camelia "is more than enough to account for the initial payment of $8,000 received by Gamaliel Hernandez on June 20, 2010."[35] Claimant's argument assumes that Claimant saved every dime which he earned from June 2009 to June 2010, when the vehicle was purchased. That is, Claimant's argument does not account for any living expenses which may have been incurred by Claimant during that time.

In his brief, Claimant implies that he was subsequently employed at La Azteca 3 Restaurant in Davenport, Iowa. Claimant asserts that his "employment at Azteca Restaurant, whether legitimate or not, effectively establishes a steady income contemporaneous with the purchase date of property defendant."[36] Claimant does not, however, provide any proof in support of his assertion. Instead, Claimant refers to pages 12 and 13 of his appendix, which is simply a photocopy of the certificate of title. While Claimant was charged by indictment with using a false identification document "for the purpose of satisfying a requirement of the employment verification system," there is no indication whether he was, in fact, hired for the job, how long he may have worked, or what he may have been paid.[37] Moreover, the indictment charges Claimant used the false identification document to obtain employment on October 25, 2010, six days after the vehicle was seized and four months after it was purchased.

---

[34] Interestingly, during eight of the seventeen pay periods, the reported tips totaled precisely $232.00.

[35] *See* Claimant's Brief (docket number 11) at 11.

[36] *See* Claimant's Brief (docket number 11) at 9.

[37] *See* Indictment, Plaintiff's App. at 47.

Claimant also asserts in his brief that his sister-in-law, Ashley Diaz, loaned him money toward the purchase of the vehicle. That claim is not supported, however, by an affidavit by Claimant, an affidavit by Ashley Diaz, or any documentation memorializing a loan. Instead, Claimant simply relies on a document showing that Ashley <u>Martin</u> was paid $9,783.12 on March 30, 2010, apparently in payment for property damage sustained to a vehicle.[38]

In support of its claim for summary judgment, the Government cites cases where the absence of legitimate income supported a finding that the property was purchased with drug proceeds. For example, in *United States v. Funds From Prudential Securities*, 362 F. Supp. 2d 75 (D.D.C. 2005), the government moved for summary judgment in the forfeiture of financial accounts. Financial records demonstrated that the funds consisted of "numerous large cash deposits of small denominations and occasionally, these deposits would occur multiple times per day." *Id.* at 78. While the claimant demonstrated income of $124,464.00 during a three-year period, she "fails to explain the $529,919 cash discovered in her apartment or produce any witnesses to support her claims of the plaintiff's witness-bias." *Id.* at 82-83. The Court granted the government's motion for summary judgment. Similarly, in *United States v. $174,206 in U.S. Currency*, 320 F.3d 658 (6th Cir. 2003), the government sought summary judgment in a civil forfeiture proceeding. A search of the claimants' safe deposit boxes resulted in a seizure of $174,206. Both claimants had been convicted on drug charges in state court. One claimant had no legitimate income during the six years prior to the seizure, while the other claimant had approximately $31,000 of income during that time. *Id.* at 660. The Fourth Circuit Court of Appeals affirmed the district court's finding that "the Claimants' legitimate income was insufficient to explain the large amount of currency found in their

---

[38] *See* Plaintiff's App. at 102.

possession." *Id.* at 662. The Court concludes, however, that the instant action is distinguishable on its facts. Unlike the cases cited above, Claimant's income here approximates the amount used to purchase the vehicle. Also, it appears likely that Claimant's tip income was under-reported on the payroll register.

The Court concludes that both motions for summary judgment fail on this issue. That is, neither party is able to establish on this record, as a matter of law, whether the vehicle was or was not purchased with proceeds from the sale of controlled substances.[39] Therefore, both motions for summary judgment will be denied on this issue.

### C. Is the Claimant an Innocent Owner?

The Claimant asserts that even if the property is subject to forfeiture "under 21 U.S.C. § 881(a)(4) or (6)," the Government's claim must nonetheless fail because he is "an innocent owner."[40] CAFRA provides that "[a]n innocent owner's interest in property shall not be forfeited under any civil forfeiture statute." 18 U.S.C. § 983(d)(1). The Claimant has the burden of proving, by a preponderance of the evidence, that he is an innocent owner. *Id.*

---

[39] The Court notes that in its brief, the Government mistakenly states that "[t]he burden is on the Claimant to prove that the defendant vehicle was paid for with legitimate funds." *See* Government's Brief (docket number 10-2) at 16. For purposes of summary judgment, *if* the Government "has shown by a preponderance of the evidence that the defendant funds are the proceeds of or are otherwise traceable to drug trafficking activities," then the burden shifts "to the claimant to set forth specific facts showing that the defendant funds consist of only legitimate income." *Funds From Prudential Securities*, 362 F. Supp. 2d at 82. Ultimately, however, the Government has the burden of establishing, by a preponderance of the evidence, that the property represents proceeds traceable to a drug transaction and, therefore, is subject to forfeiture. 18 U.S.C. § 983(c)(1).

[40] *See* Claimant's Brief (docket number 11) at 12.

Here, the Government claims that after Claimant allegedly acquired an ownership interest in the vehicle, it was used to facilitate the sale of controlled substances.[41] Under these circumstances, an "innocent owner" means an owner who did not know of the conduct giving rise to the forfeiture, or upon learning of the conduct did all that reasonably could be expected under the circumstances to terminate such use of the vehicle. 18 U.S.C. § 983(d)(2)(A). In this case, however, the Court has determined above that the Government's claim that the vehicle was used to facilitate the sale of a controlled substance fails as a matter of law. Accordingly, it is unnecessary for Claimant to rely on the "innocent owner defense" in responding to the Government's claim under section 881(a)(4).

To the extent Claimant asserts that the innocent owner defense applies to property representing proceeds from the sale of controlled substances, the Court rejects the argument. That is, *if* the Government establishes by a preponderance of the evidence at trial that the vehicle was purchased by Claimant using proceeds from the sale of controlled substances, and the property is therefore subject to forfeiture pursuant to section 881(a)(6), then the innocent owner defense provides Claimant no relief. Therefore, since the Court has rejected the Government's section 881(a)(4) claim, and since Claimant cannot be an "innocent owner" if the Government proves its claim pursuant to section 881(a)(6), the innocent owner defense has no application in this case.

------

[41] The Government asserts in its brief that "[i]t is likely that Claimant is not be [*sic*] the owner of the defendant vehicle." *See* Government's Brief (docket number 10-2) at 7. In support of its assertion, the Government cites a "declaration in support of request to proceed" signed by Claimant under oath on February 1, 2011. *See* Plaintiff's App. at 126-27. When asked whether he owned "any real estate, stocks, bonds, notes, automobiles or other valuable property," Claimant checked "NO." As Claimant notes in his brief, however, the response is an obvious mistake since the "declaration" specifically refers in the caption to the 2004 Cadillac Escalade in which Claimant was asserting an interest. In any event, there is at least a genuine issue regarding whether Claimant has an ownership interest in the vehicle.

## VII. ORDER

IT IS THEREFORE ORDERED as follows:

1.    The Motion for Summary Judgment (docket number 10) filed by the Government is **DENIED**.

2.    The Countermotion for Summary Judgment (docket number 12) filed by the Claimant is **GRANTED** in part and **DENIED** in part as set forth above.

3.    This matter will proceed to trial on the issue of whether the vehicle represents proceeds from the sale of controlled substances, and is therefore subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6).

DATED this 1st day of November, 2011.

_____
JON STUART SCOLES
UNITED STATES MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA